UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF OAKLAND, a Municipal Corporation, Acting By and Through Its Board of Port Commissioners,<br><br>    Plaintiff-Counterclaim Defendant,<br><br>    v.<br><br>SSA TERMINALS, LLC, et al.,<br><br>    Defendants-Counterclaimants. | Case No.: 11-cv-01446-YGR<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT OF THE COUNTERCLAIM** |

This case arises out of the assignment and lease of berths at the Port of Oakland. Plaintiff-Counterclaim Defendant City of Oakland, acting by and through its Board of Port Commissioners ("City" or "Port") filed a declaratory relief action in state court regarding its conduct relative to Defendants-Counterclaimants SSA Terminals, LLC and SSA Terminals (Oakland), LLC (collectively, "SSA"). (Dkt. No. 1-2.) SSA filed a Counterclaim alleging, among other claims, that the Port discriminated against it in violation of the Tidelands Grant of 1911 by granting more favorable terms to a third party. (Dkt. No. 12.) The City filed a Motion for Summary Judgment of the Counterclaim on March 1, 2012 ("Motion" or "Mot."). (Dkt. Nos. 72–75.) In its Motion, the City contends that the Counterclaim fails as a matter of law because SSA did not timely present a pre-suit claim for damages to the Port, as required by the California Government Claims Act.

Having carefully considered the papers submitted and the pleadings in this action, and for the reasons set forth below, the Court hereby **DENIES** the Motion for Summary Judgment of the Counterclaim.

## I. BACKGROUND

### A. The Parties' Agreement

On or about October 1, 2008, the Port and SSA executed an Amended and Restated Non-Exclusive Preferential Assignment Agreement ("SSA's Agreement") for the use of Berths 57–59 at the Oakland International Container Terminal ("Terminal"). (Dkt. No. 72-1, Declaration of Jean G. Banker in Support of the City's Motion for Summary Judgment of the Counterclaim ("Banker Decl."), Ex. A.) SSA's Agreement expires in October 2017, but includes an option to extend the term for two additional periods of five years each. *Id.* ¶¶ 2.2–2.3. Under a section entitled "Negotiations on More Beneficial Terms" (or a "most favored nation" clause), if the Port were to grant more favorable financial terms to the operator of adjacent Berths 55–56, the Port would be obligated to "enter into good faith negotiations with [SSA] to modify [SSA's] Agreement to provide for similarly beneficial terms to take effect as of the effective date of said agreement with the assignee of Berths 55–56." *Id.* ¶ 1.9. "Such negotiations shall take into account differences with respect to the Premises and other matters between [SSA's] Agreement and the preferential assignment agreement for such Berth 55–56 container terminal facilities." *Id.*

### B. Events Giving Rise To Dispute

In or around May 2008, the Port issued a Request for Qualifications ("RFQ") to various companies, including SSA, seeking bids for a Public Private Partnership to develop and operate Berths 20–24. Banker Decl. ¶ 3. Ports America Outer Harbor Terminal, LLC ("POA") was one of the companies that responded to the RFQ. SSA chose not to respond. *Id.* POA further participated in the Request for Proposal process and by early 2009, the Port was prepared to recommend POA's proposal for Berths 20–24 to its Board of Commissioners ("Board"). *Id.* ¶¶ 3 & 5.

On March 3, 2009, the Board held a public meeting regarding the Port's recommendation to enter into a Concession and Lease Agreement with POA for Berths 20–24 ("POA Lease") with an option to add Berths 25–26 and to "authorize the Executive Director to Execute [the POA Lease] with [POA] for the Use and Operation of Berths 20 through 24 in the Outer Harbor." Banker Decl., Ex. C (Agenda Report). At that time, International Transportation Service, Inc. ("ITS") operated Berths 25–26, as well as a portion of Berth 24 pursuant to a Space Assignment set to expire on December 31,

2

2009 ("ITS Space Assignment"). *Id.* Jon Roselle, SSA's vice president, was present and participated in the March 3, 2009 meeting.[1]

On March 17, 2009, the Board of Port Commissioners adopted Port Ordinance 4093, which "approve[d] and authorize[d] the [Port's] Executive Director to execute [the POA Lease] for the use and operation of Berths 20 through 24 in the Outer Harbor, all in accordance with the Agenda Report No. M-3 dated March 3, 2009." Banker Decl., Ex. D § 3. This ordinance stated that there would be no valid or effective agreement until "executed on behalf of the Board" and "signed and approved as to form and legality by the Port Attorney." *Id.* § 4.

On July 8, 2009, SSA's counsel wrote the Executive Director of the Port stating that it had "compared" the POA Lease for Berths 20–24 and SSA's Agreement for Berths 57–59. Banker Decl., Ex. G. The letter further stated that:

> [T]he Port of Oakland is in violation of the Shipping Act of 1984, as amended (46 U.S.C. § 40101, *et seq.*) . . . as it has granted and continues to grant [POA] excessively more favorable lease terms than those provided to [SSA]. Accordingly, unless this unlawful disparity is corrected, [SSA] will pursue its rights under the Shipping Act and seek substantial reparations.
>
> ***
>
> The Port's current practices in the disparate treatment between [SSA and POA] are unjustly and unduly discriminatory and unreasonable. We urge the Port to remedy this discrepancy immediately by modifying [SSA's Agreement] to make it more competitive with the [POA Lease]. [SSA] has provided the Port with its suggestions as to how this can be accomplished.

*Id.* at 1 & 6 (internal footnote omitted).

On or about August 3, 2009, the Port and SSA entered into a confidentiality agreement to "facilitate communications between the Parties to discuss possible ways to resolve disputes set forth in [the] letter dated July 8, 2009." Banker Decl., Ex. H ("Confidentiality Agreement"); Reply Separate Statement at City's Issue 1, fact no. 7. The Confidentiality Agreement allowed either party to terminate settlement discussions with written notice to the other side. Banker Decl., Ex. H. In a

---

[1] The Court notes that while SSA disputes that the POA Lease was "approved" by the Port at the March 3, 2009 meeting, it does not actually dispute that Mr. Roselle attended and participated in the meeting. (Dkt. No. 83 ("Reply Separate Statement") at City's Issue 1, fact no. 4.)

November 12, 2009 letter, SSA's counsel terminated the settlement discussions. Reply Separate Statement at City's Issue 1, fact no. 8; Banker Decl., Ex. I.

The Port executed the POA Lease on November 30, 2009, which the Lease defined as its "Execution Date." Banker Decl., Ex. E § 1.1 & p. S-1; *see id.* at Preamble (p. 1). However, until POA and the Port satisfied certain material conditions, POA could not take possession of the premises. *Id.* §§ 2.1(a)–(c). The parties anticipated that such conditions would be fulfilled by January 1, 2010, which they classified as the "Commencement Date." *Id.* §§ 1.1 & 2.1(b). The conditions were not insignificant. POA was required to: (i) pay an "Upfront Fee" of "$60,000,000 in cash" to the Port no later than December 31, 2009; (ii) post "Guaranty Funds" in the form of a letter of credit of one-fourth the Basic Rent for the year ($19.5 million in 2010) or $4.875 million, at least five business days prior to January 1, 2010; and (iii) pay "Basic Rent" for the first month ($1.625 million), at least one business day prior to January 1, 2010. *Id.* §§ 1.1, 2.1(a)(i)(A)–(C) & 4.2; *id.* at Schedule 1. Not until such conditions were fulfilled was the City required to deliver possession of the premises to POA. *Id.* § 2.1(b)(iii). In fact, the City had certain termination rights. *Id.* § 2.1(c)(ii).

It is not clear from the record when POA satisfied the conditions. However, it is undisputed that the Port did not record the POA Lease with the Alameda County Recorder's Office until December 30, 2009 and that POA took possession on or after January 1, 2010. Banker Decl., Ex. K.

### C. Federal Maritime Commission Complaint

On or about December 11, 2009, SSA filed a complaint with the Federal Maritime Commission ("Maritime Commission" and "Maritime Complaint") against the City of Oakland, acting through its Board of Port Commissioners. Banker Decl., Ex. J (Maritime Complaint). Mr. Roselle verified the Maritime Complaint which alleged that the POA Lease violated the Shipping Act by "granting and continuing to grant [POA] unduly and unreasonably more favorable terms for the rental and use of marine terminal facilities than those provided to [SSA]." *Id.* § IV ¶¶ A–B. SSA further alleged that:

> [SSA] has already lost substantial business, over 51,500 containers a year, because of [SSA's] significant higher rental rates. The initial loss of 51,000 containers resulted from the movement of three services to Berths 24, currently utilized by [ITS]. ITS's per acre rate for its space assignment at Berth 24 is comparable to the favorable lease terms provided to [POA]. Berth 24 will be released to [POA] pursuant to the [POA Lease] on January 1, 2010. On information and belief, arrangements have been made for these services to remain at Berth 24 after January 1, 2010, taking advantage of the preferred rates in the [POA Lease].
>
> This lost business will result in a loss of gross revenue to [SSA] of over $16.5 million per year. If the unreasonable preference to [POA] is not remedied, additional [SSA] business of approximately 200,000 containers a year could move to the [POA] Premises as a result of the lower rates [POA] is able to offer due to its significantly more favorable lease terms. This would result in a total loss of approximately $79.5 million per year to [SSA].
>
> The movement of cargo from [SSA] to the [POA] Premises was wholly anticipated and foreseen by the Port. In evaluating the [POA Lease], the Port's consultants warned that some of the carriers utilizing the [SSA] Premises would switch to the [POA] Premises beginning in 2010.

*Id.* § IV ¶¶ CC–EE. As of the date of the Maritime Complaint, SSA indicated that the POA Lease had been signed by POA, and "will be signed by the Port in December 2009." *Id.* § IV ¶ I.

### D.     California Government Claims Act

On December 8, 2010, SSA presented a claim under the California Government Claims Act ("GCA") to the Port. Banker Decl., Ex. L ("GCA Claim"); Reply Separate Statement at City's Issue 2, fact no. 14. The two-page GCA claim form requires any complaining party to identify (i) the "Date of Incident/Accident" *and* (ii) the "Date injuries, damages or losses were discovered." Banker Decl., Ex. L. Here, SSA identified both as January 1, 2010. *Id.* SSA stated that the Port caused injury when it entered in the POA Lease commencing January 1, 2010 and gave POA an "unfair, disparate competitive advantage in soliciting carriers to Berths 20–26, including carriers who used, are using, or may use [SSA's] terminal," and also "unlawfully discriminated in violation of its Tidelands grant." *Id.* SSA specified that the injury sustained was the "[l]oss of income resulting from loss of carriers having done business at [the Terminal], reduction of rates to carriers now doing business at [the Terminal], and loss of income resulting from inability to match competing rates of [POA] as a result of the unfair competitive advantage in its Concession with the Port of Oakland." *Id.* SSA stated that the amount of money they were seeking was comprised of "[l]oss of income

5

resulting from volume lost to [POA] and the need to reduce rates to retain carriers, who were solicited by [POA]." *Id.*

### E. Instant Action

On February 25, 2011, the City filed a Complaint for Declaratory Relief against SSA in the Superior Court of California, County of Alameda. (Dkt. No. 1-2 ("Compl.").) The City sought a declaration that: the POA Lease did not violate the Port's duties to SSA under SSA's Agreement; the POA Lease did not violate the Tidelands Trust of 1911 and did not otherwise violate any duties or unlawfully discriminate against SSA; and SSA's claim against City was without merit. Compl. at Prayer ¶ a. SSA removed this action to federal court on March 25, 2011. (Dkt. No. 1.)

On April 1, 2011, SSA filed an Answer (Dkt. No. 11) and separate Counterclaim for (1) Breach of the Implied Covenant of Good Faith and Fair Dealing; (2) Discriminatory Acts in Violation of the Tidelands Grant & (3) Wrongful Breach of Joint Venture Agreement (Dkt. No. 12 ("Counterclaim")). In the Counterclaim, SSA alleged with respect to the Tidelands Grant of 1911:

> Section 1(c) of the Tidelands grant to the Port states: "That in the management, conduct or operation of said harbor, or of any of the utilities, structures, or appliances mentioned in paragraph (a), no discrimination in rates, tolls, or charges or in facilities for any use or service in connection therewith shall ever be made, authorized, or permitted by said city or its successors."
>
> The Port engaged in various acts that discriminated in rates and charges to the detriment of [SSA], including, but not limited to, the agreement with POA which gave POA an unfair, disparate competitive advantage in soliciting carriers to Berths 20–26, including carries who used, are using, or may use [SSA's] terminal at Oakland International Container Terminal.
>
> As a direct and proximate result of the Port's discriminatory acts in violation of the Tidelands grant, [SSA] suffered and continues to suffer substantial damages in an amount to be determined at trial.

Counterclaim ¶¶ 18–20.

The City did not file a motion to dismiss for failure to file a timely claim. Instead, it answered (Dkt. No. 15) and then filed a motion for summary judgment on the entire Counterclaim ("First MSJ"). (Dkt. No. 21.) On November 9, 2011, the Court granted in part and denied in part the First MSJ. (Dkt. No. 48 ("First MSJ Order").) The Court dismissed SSA's claims for breach of the

6

implied covenant of good faith and fair dealing and wrongful breach of joint venture agreement. As to the claim for violation of the Tidelands Grant, the Court stated that the City had not established that the Tidelands Grant's prohibition on discrimination was inapplicable to the case at hand, and that it was a fact-intensive question to determine whether there were differences in the agreements entered into by the Port with SSA versus POA. *Id.* at 11. The City did not raise the issue that any of SSA's claims failed as a matter of law because it had not complied with the Government Claims Act.

The City filed the pending motion for summary judgment on March 1, 2012. SSA filed its Opposition to Plaintiff City of Oakland's Motion for Summary Judgment of the Counterclaim ("Opposition" or "Opp.") on March 15, 2012. (Dkt. Nos. 77–78.) City filed its Reply in Support of Its Motion for Summary Judgment of the Counterclaim on March 22, 2012. (Dkt. Nos. 82–83 ("Reply").) Prior to the hearing on the Motion, the Court issued a Notice of Questions for Hearing and permitted the parties to provide supplemental authorities on as to the Court's questions (Dkt. No. 90), which the parties provided thereafter (Dkt. Nos. 91–92).

On April 17, 2012, the Court held oral argument on the Motion for Summary Judgment. (Dkt. No. 94.) The following day, the Court requested additional briefing regarding the Tidelands Grant. (Dkt. No. 93.) The parties submitted their briefs on April 25, 2012. (Dkt. Nos. 96 & 97; *see also* Dkt. No. 98.)

## II. DISCUSSION

### A. Legal Standard Under Fed. R. Civ. P. 56

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings, depositions, discovery responses, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (dispute as to a material

fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). If there is only one inference that can be drawn from the undisputed facts, there can be no genuine dispute for summary judgment purposes. *See Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531–32 (9th Cir. 1985). When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

### B. Alleged Violation of Tidelands Grant of 1911

The City moves for summary judgment of the remaining Counterclaim for Discriminatory Acts in Violation of the Tidelands Grant of 1911.[2] The City's Motion relies upon the technical ground that SSA failed to present its GCA Claim to the Port within the prescribed timeframe of one year. Under the GCA (Cal. Gov't Code § 810, *et seq.*), an action for damages against a public entity is barred unless a claim has been timely presented to and rejected by that entity. Cal. Gov't Code §§ 905 & 910; Mot. at 7–8. A claim is timely if it is presented to the public entity "not later than one year after the accrual of the cause of action." Cal. Gov't Code § 911.2(a). The parties dispute when the claim accrued for purposes of this statute. No dispute exists that SSA filed its GCA Claim on December 8, 2010. Reply Separate Statement at City's Issue 2, fact no. 14.

#### 1. Elements of a Claim for Violation of the Tidelands Grant of 1911

To determine whether a claim has accrued, the Court must first determine the elements of the claim at issue. No California case defines the elements of an action based upon discrimination in violation of the Tidelands Grant. When defining elements, a court must look to the statute itself. *Brock v. Writers Guild of America, West, Inc.*, 762 F.2d 1349, 1353 (9th Cir. 1985) (in construing a statute in a case of first impression, courts first look to the language of the statute itself and, second, to its legislative history); *Powell v. Tucson Air Museum Found. of Pima County*, 771 F.2d 1309, 1311 (9th Cir. 1985) ("When interpreting statutes, the plain meaning of the words used is controlling, 'absent a clearly expressed legislative intention to the contrary.'") (internal citations omitted); 58 Cal.

---

[2] For ease of reference, the Court refers to the remaining Counterclaim for discriminatory acts in violation of the Tidelands Grant as "SSA's Claim." The GCA Claim, although related to SSA's Claim, refers to the claim form filed by SSA against the Port on December 8, 2010, attached as Ex. L to the Banker Declaration.

8

1 Jur. 3d Statutes § 83 (courts look to the words of a statute to give them their plain, usual, ordinary and
2 commonsense meaning, with the goal of giving the statute a reasonable construction that conforms
3 with legislative intent). On or about May 1, 1911, the City obtained control over the Port pursuant to
4 the Tidelands Grant, which required:

> That in the management, conduct or operation of said harbor, or of any of the utilities, structures or appliances mentioned in paragraph (a), no discrimination in rates, tolls, or charges or in facilities for any use or service in connection therewith shall ever be made, authorized or permitted by said city or its successors.

Cal. Stats. 1911, ch. 657 § 1(c).

Both acknowledging that they could not find cases in which a court defined the elements of a discrimination claim under the Tidelands Grant, the parties offer competing elements. The City contends that the proper elements for a Tidelands Grant discrimination claim are: (1) conduct by the Port that made, authorized, or permitted arbitrary, unjust, or unreasonable discrimination against SSA by imposing rates, tolls, or charges that were confiscatory or oppressive; and (2) some specific, identifiable trifle of injury that need not be an economic injury.[3] (Dkt. No. 96 ("City's Tidelands Brief") at 2, 5 (internal quotations and emphasis omitted).) SSA contends that the required elements are: (1) a rate difference; and (2) a rate justification based on the circumstances.[4] Neither is fully satisfactory. Each proffer inures to the benefit of the proponent.

For instance, as to the City's second element, it asserts that "damages" under the Tidelands Grant have accrued if there is "some specific, 'identifiable trifle' of injury," which need not be an economic injury. City's Tidelands Brief at 3–5 (quoting *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 324 (2011)). The City uses this argument to suggest implicitly that the threshold injury which

---

[3] As a preliminary matter, the Court notes that the City has based its elements, in part, on documents which have not been properly identified and/or lack foundation and authentication. City's Tidelands Brief at Exs. A–D (Dkt. No. 96-1–96-4); *see* SSA's Objections to City's Tidelands Brief (Dkt. No. 98). The Court sustains SSA's objection to these exhibits, to the extent that the City relies on the purported opinion of the Chief Counsel of the California State Lands Commission as authority for its proposed elements.

[4] SSA's articulation is based on the Court's First MSJ Order wherein it indicates that: "[T]he Port has not established that the Tideland Trust Grant's prohibition on discrimination is inapplicable, so long as it identifies differences in the leases entered into by SSA versus POA. In other words, differences in circumstances do not justify any rate difference; rather, the rate difference must be justified by the circumstances. This is necessarily a fact intensive question." (First MSJ Order at 11 (citing cases); Dkt. No. 97 ("SSA's Tidelands Brief") at 2.)

9

would trigger accrual of the claim is negligible. However, *Kwikset* is distinguishable. There, the issue was whether a plaintiff-consumer had *standing* to sue under the California's Unfair Competition Law in light of a change in the law requiring that any plaintiff show that they had "lost money or property" before bringing suit. Given the specific statutory language, the court held that for standing purposes, it was sufficient to show "some specific, 'identifiable trifle' of injury." *Id.* at 318–21 & 324 (internal citations omitted).[5] The Court does not find the UCL's standing requirements to be persuasive on the issue of damages under the Tidelands Grant.

Here, the statute at issue creates a public trust.[6] As such, claims against the trustee for actions harmful to the trust sound in tort. In general, such claims require a duty, breach thereof, causation, and damages. *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410 (Cal. Ct. App. 2007) (by analogy, the elements of breach of duty of loyalty mirror those for breach of fiduciary duty: the existence of a relationship giving rise to the duty, a breach of that duty, and damage proximately caused by the breach). The Court can identify no reason to depart from the historic precepts of objective, reasonable standards of tort law and apply the same to the discrimination claim here. Thus, as applied here, SSA must show that: (i) the City was engaged in the management, conduct or operation of the Port; (ii) in connection therewith, it set rates, tolls, or charges in connection with the POA Lease; (iii) the rates, tolls or charges under the POA Lease were discriminatory relative to SSA's Agreement; (iv) as a result, SSA was harmed; and (v) the City's conduct was a substantial factor in causing SSA's harm.

---

[5] The court held that "lost money or property" was not intended to be more difficult to satisfy than the federal standing requirement of "injury in fact." 51 Cal. 4th at 324. Rather, the court held that "the quantum of lost money or property necessary to show standing is only so much as would suffice to establish injury in fact." *Id.* at 324.

[6] The State of California acquired title as trustee to all navigable waterways and the lands beneath them upon its admission to the union "as trustee of a public trust for the benefit of the people." *Nat'l Audobon Soc'y v. Superior Court*, 33 Cal. 3d 419, 434 (1983) (quoting *Colberg, Inc. v. State ex rel. Dep't. of Pub. Works*, 67 Cal. 2d 408, 416 (1967)). "[C]ourts have construed the purposes of the trust with liberality to the end of benefiting all the people of the state." *Colberg*, 67 Cal. 2d at 417. Public trusts follow the same legal principles as those applicable to traditional trusts. *See Center for Biological Diversity v. FPL Group, Inc.*, 166 Cal. App. 4th 1349, 1365–68 (Cal. Ct. App. 2008) (analogizing public trust suits to those arising from regular trusts, in that a public trustee owes a duty to trust beneficiaries to protect natural resources and that the duty is breached when the trustee fails to discharge its duties). "Many of the cases establishing the public trust doctrine . . . in California have been brought by private parties to prevent agencies of government from abandoning or neglecting the rights of the public with respect to resources subject to the public trust." *Id.* at 1366.

Further, to find discrimination, SSA must show that: (i) the rates between the SSA Agreement and the POA Lease differed; and (ii) the rate difference was not reasonably justified based on the circumstances.[7]

### 2. Accrual of Claim for Violation of the Tidelands Grant of 1911

The Court now moves to the issue of when the claim accrued so as to trigger the one-year requirement for the pre-filing of a GCA notice. Under the GCA, "the date of the accrual of a cause of action to which [the GCA] claim relates is the date upon which the cause of action would be deemed to have accrued within the meaning of the statute of limitations which would be applicable thereto if there were no [pre-suit notice] requirement." Cal. Gov't Code § 901. "In general, a claim accrues upon the occurrence of the last element essential to the cause of action, even if the plaintiff is unaware of the cause of action." *Brandon G. v. Gray*, 111 Cal. App. 4th 29, 35 (Cal. Ct. App. 2003). "When damages are an element of a cause of action, the cause of action does not accrue until the damages have been sustained." *Sullivan v. JP Morgan Chase Bank, NA*, 725 F. Supp. 2d 1087, 1095 (E.D. Cal. 2010) (quoting *City of Vista v. Robert Thomas Securities, Inc.*, 84 Cal. App. 4th 882, 886 (Cal. Ct. App. 2000)). "A wrongful act, such as . . . a statutory violation, causing only nominal damages, speculative harm, or the threat of future harm-not yet realized-does not suffice to create a cause of action[.] Instead, the cause of action does not accrue . . . until the plaintiff sustains actual and appreciable harm." *Garver v. Brace*, 47 Cal. App. 4th 995, 999–1000 (Cal. Ct. App. 1996) (internal citations and quotations omitted).

In its Motion, the City contends that SSA's Claim accrued when SSA "had information sufficient to put a reasonable person on inquiry of the Port's creation of any allegedly discriminatory rental rate disparity" and *not* when POA physically took possession of Berths 20–24 on January 1, 2010, as SSA argues. Mot. at 9; Opp. at 8. The City sets forth five possible factual scenarios for

---

[7] Further, it bears noting that the City essentially conceded this point when it previously argued that "'[d]iscrimination' under the Tidelands Trust requires unjust conduct, preferring one operator over another under equivalent facts and circumstances. . . . The facts and circumstances underlying the SSA contract for Berths 57–59 and the third-party lease for Berths 20–24 are fundamentally different, and the Port has not 'preferred' any operator to SSA." First MSJ at 2.

11

when SSA's Claim "accrued" arguing that, at each point in time, SSA had enough sufficient knowledge to put it on notice of the alleged violation of the Tidelands Grant:

(1) October 1, 2008 – when Port and SSA executed SSA's Agreement, which set the rental rate that SSA now complains is discriminatory and has caused damage. Mot. at 9–10.

(2) March 2009/July 8, 2009 – when the Port agreed to the terms that SSA contends created the unfair rental rate disparity in relation to POA (in the public meeting and subsequent Port Ordinance 4093, both occurring in March 2009) and subsequent acknowledgement on July 8, 2009 from SSA's counsel that the Port had violated the Shipping Act (not the Tidelands Grant of 1911) by granting POA more favorable terms in the POA Lease. Mot. at 10– 11. The City contends that SSA admitted in July 2009 that it had already suffered discrimination and damages by the Port. Mot. at 3; *see* Banker Decl., Ex. G.[8]

(3) August 3, 2009 – when SSA and the Port entered into the Confidentiality Agreement to facilitate resolution of the disputes raised in the July 8, 2009 letter. Mot. at 11–12.

(4) November 12, 2009 – when SSA terminated settlement discussions with the Port. Mot. at 12.

(5) November 30, 2009 – when the Port executed the POA Lease. Mot. at 12. The City contends that as of this date, "the Port became obligated to honor the rental rate terms thereof, and each had other substantial, immediate performance obligations before . . . January 1, 2010." Mot. at 12.

The City argues that because SSA did not file the GCA Claim by November 30, 2010, under any of the referenced scenarios, SSA's Claim is untimely. Mot. at 9 & 13–14.

By contrast, SSA makes two arguments. First, that a GCA Claim was not required here because the City, not SSA, initiated the instant action and SSA's Counterclaim is based upon the same set of contracts underlying the City's own action (*i.e.*, SSA's Agreement and the POA Lease). Opp.

---

[8] This is based on SSA's counsel's letter that, among other things, demanded a modification of the SSA Agreement because "[t]he Port's current practices in the disparate treatment between [SSA] and [POA] are unjustly and unduly discriminatory and unreasonable." Banker Decl., Ex. G. at 6. SSA's counsel further stated that the differential treatment was "already causing [SSA] to lose at least 51,500 containers per year." *Id.* at 4.

12

at 1 & 5. As such, SSA was not required to present the Port with a claim for damages under the GCA at any time. *Id.* Second, SSA contends that if a GCA Claim was required, it was timely because SSA's Claim for damages did not accrue until, at the earliest, the POA Lease became operative. *Id.* at 7–8. SSA contends the effective date of the POA Lease was the "Commencement Date," identified as January 1, 2010. *Id.* at 8. On this date, POA was to take possession of the property and all conditions precedent (as laid out in the POA Lease) were projected to be satisfied. *Id.* at 1 & 8–9; Reply Separate Statement, City's Issue 1, fact nos. 9–11; *see* Opp. at 8 (also referring to the critical date as when the POA became "operative"). SSA contends that it could not have accrued or suffered any damages until POA had the right to actually contract with potential customers. It could not do so before it took possession and the POA Lease became fully operative. Opp. at 8–9.

The fundamental question raised focuses on when damages accrued. The Court turns to California law. The California Supreme Court has held that a statute of limitations "cannot run before plaintiff possesses a true cause of action, by which we mean that events have developed to a point where plaintiff is entitled to a legal remedy, not merely a symbolic judgment such as an award of nominal damages." *Davies v. Krasna*, 14 Cal. 3d 502, 513 (1975). The harm must be "actual and appreciable." *Id.* at 514. Based on these concepts, California courts have "uniformly agreed," for instance, that the statute of limitations does not bar a claim arising out of an illegal provision in a promissory note—even though the terms of the note were known and knowable at the time of execution—until a demand is actually made or the payment is due. *Garver*, 47 Cal. App. 4th at 1000. In *Garver,* the appellate court reversed a trial court for dismissing a claim on the basis that the statute began to run upon the "execution" of the note because plaintiffs were "obligated" to pay the fee at issue, even though the amount was not due. *Id.* at 1000–01. The court held that a "contrary holding would require the filing of a declaratory relief action whenever terms of a contract revealed the slightest hint of disagreement" and encourage "premature litigation." *Id.* at 1001.

Additionally, in *Aaron v. City of Los Angeles*, in the context of a claim for inverse condemnation to recover the loss of value of property resulting from jet noise, the court noted that the accrual of a cause of action necessarily depended on the circumstances. 40 Cal. App. 3d 471, 491–92 (Cal. Ct. App. 1974) (defendant asserted claim accrued more than one year prior to filing of GCA

13

1 claim).  There, the homeowners knew about the jet noise but the court held that the claim "did not

2 accrue at the point the homeowners first became annoyed." *Id.* at 492.  It only accrued once "the

3 flights substantially interfered with the use and enjoyment of plaintiffs' properties and resulted in a

4 diminution of their market value." *Id.*  Plaintiffs "were not required to sue as soon as the damaging

5 flights began but were entitled to some extent to wait until the situation had stabilized." *Id.*

6       In this context, the gravamen of the 1911 Tidelands Grant discrimination claim is whether

7 SSA and POA, who under their respective agreements each took possession of land subject to a public

8 trust, were treated differently without just cause.  To make that determination, the agreements

9 themselves must be effective, otherwise, the claim, as in *Garver*, would be premature.  Thus,

10 appreciable damages here can only accrue once the rates at issue were actually *in effect*, and thereafter

11 proven to have caused damage to SSA because of discriminatory rates.

12       Accordingly, with respect to the scenarios presented by the Port for when the SSA's Claim

13 accrued, the Court rejects the City's first two accrual scenarios.  Each of those scenarios focuses on

14 the City's "act" of setting rates, either with SSA or POA.  While the "act" of setting the rate is an

15 element of the underlying claim, the act itself was not consummated until the agreement at issue took

16 effect.  Thus, SSA's Claim had not accrued in those scenarios.

17       In its next three scenarios, the City essentially argues that SSA's damages accrued once it

18 *anticipated* the damages.  The parties do not dispute the following material facts, that: (i) the City

19 executed the POA Lease on November 30, 2009; (ii) the POA Lease contained material conditions

20 precedent; (iii) POA needed to perform said conditions before taking possession of the premises; (iv)

21 the POA Lease anticipated that said completion and possession would begin on the "Commencement

22 Date" of January 1, 2010; and (v) the City did not record the Memorandum of Concession and Lease

23 Agreement ("Lease Memorandum") until December 30, 2009.  Reply Separate Statement at SSA's

24 Issue 1, fact nos. 2–5; *id.* at City's Issue 1, fact no. 9; Banker Decl., Exs. E & K.

25       As existed in *Garver*, *supra*, the Court is not persuaded by the City's argument that anticipated

26 damages should be sufficient to trigger SSA's statute of limitations.  The validity of the POA Lease is

27 fundamental to SSA's Claim.  Without it, SSA cannot assert a claim that, in the management of the

28 Port, a third party received preferential treatment to SSA's detriment.  Had POA not satisfied the

14

conditions and the POA Lease not become effective, SSA could not have stated a valid claim against the City for acts relative to rates in a non-existent lease. To find otherwise would encourage premature litigation. While the City may argue the conditions in the POA Lease did not render it speculative because the Lease provisions only permitted termination for certain events (Reply Separate Statement at SSA's Issue 1, fact no. 5), the conditions were not insignificant. The City itself did not act to record the Lease Memorandum until December 30, 2009, at which time the City gave constructive notice to the public of its effectiveness. Banker Decl., Ex. K; *see*, *generally*, Harry D. Miller and Marvin B. Starr, 5 Cal. Real Est. § 11:60 (3d ed. 2009) (Recordation as Constructive Notice). Moreover, no evidence has been presented to this Court that SSA actually knew that the POA Lease was signed on November 30, 2009. To the contrary, evidence exists that as of December 11, 2009, SSA believed that the POA Lease would not be signed until sometime in December 2009. Maritime Complaint § IV ¶ I. Physical possession, mentioned frequently, is only relevant to the extent it showed that the conditions had been satisfied and the POA Lease had become effective.

The City also argues that SSA's Claim should be barred "as soon as SSA had information sufficient to put a reasonable person on inquiry of the Port's creation of any allegedly discriminatory rental rate disparity." Mot. at 9. However, both the argument and the underlying legal principle presuppose that damages have accrued. *See*, *e.g.*, *Glue-Fold, Inc. v. Slautterback Corp.*, 82 Cal. App. 4th 1018, 1029 (Cal. Ct. App. 2000) ("A limitation period does not begin until a cause of action accrues, i.e., all essential elements are present and a claim becomes legally actionable. Developed to mitigate the harsh results produced by strict definitions of accrual, the common law discovery rule postpones accrual until a plaintiff discovers or has reason to discover the cause of action.") (internal citations omitted); *City of Vista*, 84 Cal. App. 4th at 886 (when damages are an element of a claim, the claim does not accrue until damages have been sustained).

The Court agrees that SSA knew of the impending POA Lease and anticipated some measure of damages. However, as set forth above, until the POA Lease became effective, actual and appreciable damages could not have accrued for purposes of beginning the statute of limitations.

### 3. SSA's Complaint Regarding Violations of the Shipping Act

The City's argument that SSA's Claim is barred because SSA filed a verified complaint before the Maritime Commission on December 11, 2009 does not change the analysis. The City argues that SSA admitted that damages accrued prior to December 8, 2009 by alleging that the Port had acted similarly by giving third-party ITS lower rates, and to the extent damages accrued based on ITS' rates, they merely continued under the POA Lease. Mot. at 4–5. Under this scenario, SSA would not have complied with the Government Claims Act.

More specifically, the City argues that in the Maritime Complaint, SSA: (i) admitted that ITS lured business away from it because SSA has to pay significantly higher rental rates than ITS; (ii) admitted that POA and ITS had "comparable" rate structures; and (iii) estimated that the losses it sustained to ITS would continue in the future once POA took over the premises because POA's rates would still be lower than SSA's. Reply at 5. In other words, the City contends that because SSA alleged it was already paying its higher rate (per the SSA Agreement) and not a more favorable, lower rate, it was being discriminated against and "there is no logical distinction between the Port's treatment *of SSA* during the respective tenancies of ITS and POA for the purposes of SSA's discrimination claim." *Id.* The City argues that the "identity of the beneficiary of the Port's alleged rate discrimination is irrelevant." *Id.*

To evaluate the alleged admissions, the Court reviews the Maritime Complaint in its totality. SSA does allege therein conduct relative to both the ITS Space Assignment and the POA Lease. The relevant allegations are as follows:

> The Port's agreement with [POA] violates the foregoing provisions of the Shipping Act by granting and continuing to grant [POA] unduly and unreasonably more favorable terms for the rental and use of marine terminal facilities than those provided to [SSA].

Maritime Complaint § IV ¶¶ B. SSA also alleged that the City's conduct resulted in more favorable terms, resulting in lost business and higher rents and costs than those charged and agreed to be charged to ITS and POA. Specifically as to lost business, the Maritime Complaint alleged that SSA had:

> [A]lready lost substantial business, over 51,500 containers a year, because of [SSA's] significant higher rental rates. The initial loss of 51,000 containers resulted from the movement of three services to Berths 24, currently utilized by International

16

> Transportation Services, Inc. ("ITS"). ITS's per acre rate for its space assignment at Berth 24 is comparable to the favorable lease terms provided to [POA]. Berth 24 will be released to [POA] pursuant to the [POA] Lease on January 1, 2010. On information and belief, arrangements have been made for these services to remain at Berth 24 after January 1, 2010, taking advantage of the preferred rates in the [POA] Lease.

*Id.* § IV ¶ CC.

> As a result of the Port's aforementioned violations of the Shipping Act, [SSA] has sustained and continues to sustain injuries and damages, including but not limited to lost business and higher rents, costs, and other undue and unreasonable payments and obligation to the Port. [SSA] believes its damages are in the millions of dollars. A more precise amount will be determined at the hearing.

*Id.* § VI ¶ A.

As the Court identified in its First Order, and expands upon herein, a claim under the Tidelands Grant of 1911 requires a comparative analysis of rate-setting in the operative agreements themselves. The rate is only one component. *Cf. City and County of San Francisco v. Western Air Lines, Inc.*, 204 Cal. App. 2d 105 (Cal. Ct. App. 1962) ("Whether in particular instances a difference of rates as between users of a public utility service constitutes unjust discrimination, or whether such difference is justified by the conditions and circumstances attending such use, are questions of fact depending on the matters proved in each case.") While the rental rate paid by ITS may be lower, the circumstances surrounding the same are unclear based on the facts provided by the City. These are not short, standard agreements. The POA Lease itself is 128 pages without schedules and exhibits. Banker Decl., Ex. E. Here, the ITS Space Assignment is not a basis for relief in the instant lawsuit; the GCA Claim and Counterclaim are "specific to the POA [L]ease." Opp. at 9. Because the Maritime Complaint asserted claims stemming from both the prior ITS Space Assignment and the anticipated POA Lease, the Court does not interpret said complaint to contain admissions of past damages relative to the POA Lease. To the contrary, the Maritime Complaint is replete with references that the damages relative to the POA Lease were anticipatory. Maritime Complaint § IV ¶ I (POA Lease "will be signed by the Port in December 2009") (emphasis supplied); *id*. ¶ Y (POA "will pay in 2010 Basic Rent of $19,500,000. . . ") (emphasis supplied); *id*. ¶ AA (the "projected variance between the assignment of the [SSA] Premises and the lease of the [POA] Premises in 2010 is approximately $102,829 per acre or over $15.5 million for 2010 alone. This variance is projected to increase dramatically in subsequent years.") (emphasis supplied); *id*. ¶ DD ("This lost business will

17

result in a loss of gross revenues to [SSA] . . . ") (emphasis supplied); *id*. ¶ EE (City's "consultants warned that some of the carriers utilizing the [SSA] Premises would switch to the [POA] Premises beginning in 2010") (emphasis supplied); *id*. ¶ JJ ("The projected movement of containers cargo from the [SSA] Premises to the [POA] could result in cumulative revenue losses . . . ") (emphasis supplied.). Accordingly, the Court does not find that the Maritime Complaint contained verified admissions of past damages relative to the POA Lease.

### C. Compliance With The Government Claims Act

As set forth above, the Court finds that here, a claim for a violation of the Tidelands Grant of 1911 did not accrue until, at a minimum, December 30, 2009 (when the Lease Memorandum was recorded) or on or after January 1, 2010 (when POA took possession showing the POA Lease had become effective). SSA filed its GCA Claim on December 8, 2010. Accordingly, the Court finds that under either scenario, it was timely filed.

In light of the foregoing, the Court declines to make a finding with respect to SSA's two alternative arguments. Namely, that SSA was not required to present a GCA Claim because, despite asserting a Counterclaim for affirmative damages, the City initiated this action against SSA and thus SSA was not required to give notice under the GCA. Opp. at 5–7. Or, alternatively, that the intended purpose of the GCA's notice requirement was fulfilled because SSA and the Port engaged in settlement discussions throughout 2009 regarding the damages SSA anticipated from the POA Lease. *Id.*

### III. CONCLUSION

For the reasons set forth herein, the City's Motion for Summary Judgment of the Counterclaim is **DENIED**. This Order terminates Dkt. No. 72.

**IT IS SO ORDERED.**

Dated: June 27, 2012

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**